# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 21-8

**S.B. IN THE INTEREST OF**

**A.J.N. AND S.R.N.**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 2009-47
HONORABLE JOHN C. DAVIDSON, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**D. KENT SAVOIE**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Chief Judge, Billy Howard Ezell, and D. Kent Savoie, Judges.

**AFFIRMED.**

**Kelvin G. Sanders**
**418 Desoto Street**
**P.O. Box 13922**
**Alexandria, LA 71315**
**(318) 487-0009**
**COUNSEL FOR APPELLANT:**
  **S.B.**

**William B. Allen, Jr.**
**711 Washington Street**
**Alexandria, LA 71301**
**(318) 443-4900**
**COUNSEL FOR APPELLEE:**
  **T.N.**

**SAVOIE, Judge.**

S.B. appeals the juvenile court's judgment that returns the custody of her two minor grandchildren, A.J.N., born March 18, 2008, and S.R.N., born May 2, 2009, (collectively, "the children"), from S.B. to their father, T.N. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 2, 2009, S.B. filed a Petition for Transfer of Custody in juvenile court ("the juvenile case") seeking legal custody of the children. Therein, S.B. alleged that the children were in her care, that the children's natural mother was unable to care for them, and that T.N. was also unable to care for the children because he was attending college in Lafayette and a member of the Louisiana National Guard who would be deployed with his unit in January 2010. S.B. is T.N.'s mother. S.B. attached to her petition an affidavit signed by T.N., stating that he desired for custody of the children to be given to his mother, S.B.

On October 22, 2009, the juvenile court signed a Judgment of Custody awarding S.B. with "the legal care, custody and control of the minor children . . . , reserving all of their parental rights unto [the children's mother] and [T.N.]" The judgment did not set forth a visitation schedule or otherwise impose any obligations on the part of the children's parents. An essentially identical judgment entitled "Amended Judgment" was signed November 6, 2009.

On December 29, 2016, the juvenile court signed a Consent Judgment stating that T.N. had agreed to pay S.B. $500.00 per month for child support, beginning January 1, 2017, and ordering T.N. to do the same in accordance with the agreement.

On July 31, 2019, S.B. filed a Petition for Protection from Abuse in civil court ("the civil case") on behalf of the children. Therein, she alleged that T.N. had failed to return the children to her after Father's Day, and, as a result, T.N. was arrested and put into police custody on July 25, 2019. The civil district court granted temporary protective orders, and subsequent hearings were continued several times at the request of counsel.

On September 5, 2019, T.N. filed a petition in the civil case seeking sole custody of the children and a dismissal of the protective order. Therein, he alleged that he was unaware of the juvenile case proceedings. Rather, according to T.N., he signed several military powers of attorney granting S.B. temporary custody of the children. T.N. further alleged that, while S.B. had exercised temporary custody of the children while he was on active military duty, completed school, and began his civilian career, which required extensive travel for four years, he spent holidays, weekends, and as much time as possible with the children during this time. He further alleged that he had since obtained a new position with a schedule that allows him to be home every night. T.N. also stated in his petition that, in addition to the change in job and his personal circumstances, the following also supported returning custody of the children to him: S.B. had him arrested on kidnapping charges when it was S.B. who refused to come to Houston to pick up the children following Father's Day weekend; S.B. obtained a temporary protective order without any evidence that the children were in immediate danger of harm or abuse; and S.B. cut off contact between the children and T.N.

A hearing in the civil case was held on September 23, 2019. T.N. was represented by counsel, and S.B. appeared pro se. The transcript from this hearing indicates that the parties stipulated to dismiss the protective order and to give T.N.

2

visitation with the children every other weekend. The transcript further reflects that all parties were to be evaluated by Ms. Gay Coleman and that the matter would be continued without date pending the completion of the evaluations.

Following another hearing in the civil case on December 16, 2019, the trial court rendered a judgment on April 23, 2020, ordering the children to remain in S.B.'s custody until the end of the 2019-2020 school year, after which T.N. was to have sole custody subject to visitation by S.B. The judgment further ordered T.N. to pay $250.00 in child support through May 2020, and it also set the matter for a hearing to establish a visitation schedule in accordance with Ms. Coleman's report.

On April 30, 2020, S.B. filed a Motion and Order for New Trial arguing that the April 23, 2020 judgment was rendered without evidence. Following a May 2020 phone conference with the parties, the civil district court rendered a judgment on June 9, 2020, granting S.B.'s motion and setting the matter for an evidentiary hearing. In addition, the judgment granted T.N. with summer visitation with the children from May 22, 2020, through June 21, 2020.

On June 22, 2020, S.B. filed a motion in the civil case seeking to transfer the matter to the juvenile court under the juvenile case's docket number. Therein, S.B. suggested that, in accordance with the Louisiana Children's Code, the juvenile court had exclusive jurisdiction over the matter. A hearing on the motion was held the same day, and the matter was set for hearing before the juvenile court. Meanwhile, the court indicated that the children were to remain with T.N.

Also on June 22, 2020, T.N. filed a Petition for Ex-Parte Order of Custody in the juvenile case, stating that the children have been living with him for the past month, and that based on circumstances stated in the petition, including an incident that was video-recorded by the children wherein S.B. could be heard excessively

3

screaming, cussing and beating S.R.N., and a report from Ms. Coleman indicating her concerns that S.B. would retaliate against the children if custody was to remain with S.B., and the children are in immediate danger while in S.B.'s care. The parties thereafter agreed to setting the matter for hearing, and the requested ex parte relief was not granted.

An evidentiary hearing was held in the juvenile case on July 27, 2020. After the evidentiary hearing, the juvenile court took the matter under advisement, but stated on the record that the children were to remain with T.N. pending the court's decision. Thereafter, the trial court issued written reasons, which stated:

> A Petition for Transfer of Custody was submitted by [S.B.] with the judgment transferring custody signed on 22 October 2009. An Amended Judgment of Custody was signed on 6 November 2009. A Consent Judgment was signed on 29 December 2016. . . . No hearing was conducted in connection with any of these judgments. The initial transfer of custody [to S.B.] was a Consent Judgment, as well as the judgment setting forth the support amount containing the signature of [T.N.] [T.N.] denies signing any consent judgment or petition. His testimony on the validity of his signature is not credible.
>
> . . . .
>
> Initially, custody was voluntarily transferred to [S.B.] because [T.N.], a member of the armed forces, was set to be deployed. Upon returning from deployment, [T.N.] began attending school in Lafayette and left his children with [S.B.] The girls lived with [S.B.] for most of their life. In the past years, tension has risen in [T.N.'s] and [S.B.'s] relationship and in [S.B.'s] relationship with the girls. [T.N.] seeks to terminate the voluntary transfer and raise his children. The law governing this matter is set forth below [in La.Ch.Code. art. 1523.]
>
> . . . .
>
> [S.B.] has had custody for over ten years. She has been the sole caretaker of these children. The children are doing well in school and are active in their church.
>
> [T.N.] is employed and living in Houston with his wife and her three young children. Their home has adequate space for both [A.J.N.

4

and S.R.N.] [T.N.] often works off [sic] but [his wife] owns a business that allows her to work from home.

[T.N.'s] contact with his children has been lacking over the entire time his children have been with [S.B.] Despite the deficiency in his contact with his children, the children are bonded with their father. In fact, the children clearly indicated a desire to live with their father.

[T.N.] has made limited effort to exercise parental responsibilities, including support, while the children have been in [S.B.'s] care. He did not fully comply with the support order, but did make some payments. He did not attend a majority of the events in which his children participated. He contended he was busy with school and work. However, his children are bonded to him. The terms of the custody judgments only allow [S.B.] the authority to care for the children. There are no custody provisions placing responsibility on [T.N.], outside of the later support order.

Recently, events involving [S.B.] have occurred that raise serious concerns about her role in the lives of these children. In June 2019, [T.N.] and [S.B.] got into a dispute about [T.N.] returning the children who were with him in Texas. Instead of filing a rule for contempt or seeking other relief from the [c]ourt, a warrant was issued for two felony counts of kidnapping. [T.N.] was arrested in Texas and stayed in jail thirteen days. The children were taken from his home and returned to [S.B.] The custody judgment contained no visitation parameters. Moreover, a protective order was issued against [T.N.] The kidnapping charges and protective order were dismissed.

A second disturbing incident was documented on a video recording of [S.B.] working with [S.R.N.] on a school assignment involving math. In the incident, which is not disputed, [S.B.] can be heard yelling, cussing, and striking [the child] in an effort to give [her] an "appropriate" answer. Comments were heard such as "want to act an ass, I'll act an ass with you." [S.B.] testified she struck [the child] six times but the strikes were slaps on her arm. [S.B.] testified she regrets the words, but added she "was in my own home, not around anyone." [S.B.'s] actions convince this [c]ourt that she will not support the relationship of the children with their father.

The juvenile court then rendered a judgment on August 7, 2020, ordering

that the custody of the children is returned to T.N.

S.B. appeals. She asserts as her sole assignment of error that "[t]he trial court erred in granting a change of custody from appellant, S.B., to appellee, T.N., pursuant to La.Ch.C[ode] [a]rticle 1523[.]"

## ANALYSIS

As noted by the trial court, S.B. was initially granted custody of the children pursuant a petition for a voluntary transfer of custody contemplated by La.Ch.Code art. 1510, et. seq. These articles "govern a voluntary transfer of custody of a child by parents to other responsible adults for the purpose of enabling the child to receive adequate care and treatment" and are "intended to promote mutual understanding of the rights and responsibilities of the parents and custodians and of any terms or conditions which may be set forth by agreement of the parties." La.Ch.Code art. 1510. "Voluntary transfer of custody" is defined as "a parent's knowing and voluntary relinquishment of legal custody to . . . an individual, subject to residual parental rights retained by the parent[.]" La.Ch.Code art. 1511. "'Residual parental rights' means those rights and responsibilities remaining with the parents after the legal transfer of custody of their child, including but not necessarily limited to right of visitation, consent to adoption, right to determine religious affiliation, responsibility of support, and the right of inheritance from the child." La.Ch.Code art. 116(24).

Louisiana Children's Code Article 1523 further contemplates a parent's revocation of a voluntary transfer of custody, stating:

> A. Upon failure of a custodian to return a child after revocation of the parent's consent, the parent may move for dismissal of the proceedings and for the return of the child to their custody.

> B. The motion to dismiss shall be set for contradictory hearing with the custodians.

6

C. In making its determination of the best interests of the child, the court shall consider the following:

(1) The length of the parent/child separation.

(2) The current fitness of the parent.

(3) The frequency of contact between the parent and child during the separation.

(4) The efforts made by the parent to exercise parental responsibilities during the separation, including support.

(5) The terms and conditions of the judgment.

In *In Interest of CLS*, 94-531, p. 9 (La.App. 3 Cir. 11/2/94), 649 So.2d 532, 538-39, this court addressed a parent's requested revocation of a voluntary transfer of custody pursuant to La.Ch.Code. art. 1523, stating:

After completing a voluntary transfer of custody, parents may only regain custody of their child if the other party to the transfer agrees to return the child, or upon successful motion to the court. La.Ch.C. Art. 1522. Before a court may authorize the return of a child to the natural parents after a voluntary transfer of custody, the court must find that it is in the best interests of the child. La.Ch.C. Art. 1523. When deciding whether a child should be returned to his natural parents after a voluntary transfer of custody, the court must consider: (1) the length of the parent/child separation; (2) the current fitness of the parents; (3) the frequency of contact between the parents and child during the separation; (4) the efforts made by the parents to exercise parental responsibilities during the separation, including support; and, (5) the terms and conditions of the judgment. *Id*.

The trial judge is vested with great discretion when making a determination of child custody[,] and his decision will only be reversed upon a clear showing of abuse of discretion. See *Thompson v. Thompson*, 532 So.2d 101 (La.1988). In a custody contest between parents and non-parents, the parents enjoy a paramount right to custody and may be deprived of that right only for compelling reasons. *Wood v. Beard*, 290 So.2d 675 (La.1974). When possible[,] a child should remain in the natural parents' custody to maintain family unity and help the child identify as part of the natural family unit. *State in the Interest of Sylvester*, 525 So.2d 604 (La.App. 3d Cir.1988).

In the instant case, T.N. testified that, beginning in 2004, he was actively engaged in military service. He indicated that in 2009, the children's mother asked

7

S.B. to keep the children because she could not and because T.N. was in college and getting ready to deploy to Iraq in January of 2010. T.N. explained that, at that time, the children's mother had placed S.R.N. (who was an infant at the time) up for adoption without T.N. knowing and T.N. was informed of this via a letter in the mail. Thereafter, T.N. and S.B. were able to obtain S.R.N. because he had not relinquished his parental rights.

According to T.N., he was not aware of, and did not participate in, any juvenile court proceedings involving custody or child support pertaining to his children, and he was not aware of any consent judgments; however, he did indicate that he gave S.B. temporary custody of the children, completed a Family Care Plan through the military, and signed a Power of Attorney.

T.N. testified that while he was deployed, he would write letters and attempt to call home, but, given that A.J.N. was a year old at the time and S.R.N. was only six-months old, he was not really able to communicate with them.

T.N. explained that after his first deployment ended, he was on active duty with the National Guard and reenrolled in college at the University of Louisiana at Lafayette. T.N. testified that during this time, the children stayed with S.B. in Alexandria because he only had a one-bedroom apartment in Lafayette, was not married, was attending college full time, and had to attend military training exercises. He further testified that, during this time, he would visit the children and S.B. at least once a month in Alexandria. The children were ages one and two at the time. T.N. stated that he tried to visit them as much as he could, but he would often have school projects on the weekends.

T.N.'s next deployment was in 2013. He testified that he completed his spring semester of college and then deployed in August 2013. He indicated that

8

summer training lasted three to four weeks in Pineville, and then, following a break for several weeks, he went to Fort Bliss for mobilization training and deployed from there. He testified that when he was not involved in military training and off from school, he visited the children at least every other weekend.

T.N. returned from deployment in August of 2014. He testified that he left the military and transitioned back to part-time service with the National Guard because they were assisting him financially with college. From September through December 2014, T.N. completed coursework online, and he moved from Louisiana to Houston, Texas. He explained that there were more job opportunities for his chosen field in Texas, and that there was a chance to provide more opportunities for his children to have a more successful life. He further indicated that he eventually withdrew from college permanently after moving to Texas.

Meanwhile, the children continued to live with S.B. T.N. testified that during this time he had a good relationship with his children. He said that he tried to call and see them as much as he could when he did not have field training, but that he did not get many calls from them.

T.N. explained at trial that he has resided in the Houston area since 2014. He has been employed consistently and currently works for Acuren Inspections in La Porte. He has lived at three different residences during this time, including a two-bedroom, two-bath house, a one-bedroom apartment, and his current residence, which is a two-story, five-bedroom, 2.5-bathroom house in a neighborhood near Sugarland. He stated that he has lived at this residence since July 2019 with his current wife and her three children. All of the children have their own bedroom, except S.R.N., who shares a room that has bunk beds with T.N.'s wife's daughter, at the children's request. T.N. and his wife were married in March 2020.

T.N. testified that while living in Houston, he would attend some of his children's events in Alexandria, but that he worked during the week and was not able to visit them. He explained that he worked in the oil and gas industry, had to work outages and turnarounds, and had to travel out of state for work. T.N. also explained that S.B. would update him regarding the children's grades because he was only able to go to the school once or twice.

T.N. further testified as to an incident involving he and S.B. beginning on Father's Day of 2019. He explained that he had met S.B. in Orange, Texas to pick up the children and that they stayed with him for the weekend. However, on Sunday, S.B. indicated to him that she was not feeling well and wanted him to drive the children from Houston back to Alexandria. He stated that it was Father's Day, he had not gotten to spend a lot of time with them, and so he decided to keep the children with him. He testified:

> The kids stayed with me over the weekend, and Sunday came around and I tried to get wit' my Mom about what time would she wanta meet up, and she . . . was telling me that she didn't feel well . . . she wun't coming to meet me halfway. . . . And I'm like, well, you know, I kinda planned to meet you halfway. . . . That's, that's how we've always done it. . . . and then some things blew up about her telling me that, me keeping 'em and different stuff like that. If I don't wanta bring 'em back, and I'm gonna need her, and, I mean. . . . I had my oldest daughter contact her and ask her. And she responded to my oldest daughter that I needed to send her a deposit. She wun't concerned about comin' to get them [.]

When asked by counsel what the deposit was for, T.N. further testified:

> I don't know. . . . I was sending her money from time to time, at least once a month, whatever I had, and . . . 'cause I'm still buying them stuff too. So, I mean, they have stuff at my house jus' like stuff that they have over at her house, I bought some of it, or I sent her money and she bought it. So I don't know what this deposit's about. . . . And, I talked to her about me possibly switching it up a little bit, because for my own accountability purposes and record purposes, that I wanted to start sending 'er gift cards, and if the kids had something they were participating in, . . . I'll write the check and send it to 'em

because I was just startin' to feel like that money I was sending wasn't being spent on them, because they never had anything new. . . .  And she never bought 'em anything new.

T.N. further testified that after the disagreement with S.B., he contacted his girlfriend (now wife), who was spending time with her family for Father's Day, and asked her to come back to help him with the children, "[a]nd she came back after I told 'er what happened with [S.B.], and from then on I kept 'em, all up until I got a surprise at my front door, and I was being arrested for two felony counts of kidnapping, my own children."  T.N. explained that as he was walking out of his garage, the police "swarm[ed]" his house, pulled guns on him, told him to get on the ground, and handcuffed him.  He testified that he was in jail approximately ten business days, or thirteen days total, but ultimately the charges against him were dismissed.

T.N. did not see his children again until September 2019.  At that time, he and S.B. appeared in court and stipulated to dismiss the protective order against T.N. and give T.N. visitation with the children every other weekend.  With respect to the tentative visitation agreement in the civil case, T.N. stated:

> that was a rough one.  Ah, driving four and a half hours from Houston to Alexandria and four and a half hours back, not being able to meet up half way.  And I was still sending her money . . . that's the money we agreed I would send.  I send what I send, you know, it's not court ordered that I send you anything, because I haven't been to court and signed anything . . . .  But I was sending her money, spending money on gas, rental cars, food, hotels, all that different stuff to drive back and forth.  Because, yeah, she did offer for me to . . . stay at her house, but I have a family, and I want my children to spend time with their new Mom and their other siblings.

T.N. testified that, during this time, contact with his children while they were with S.B. was minimized because A.J.N. was not allowed to use the cell phone T.N. had bought for her, or she would otherwise get in trouble for talking to

him if it was too late when he would call after work. He testified that, according to the children, when he would call S.B. to talk to them, S.B. would not answer the phone or would not have them call him back. T.N. explained that the only time he talked to his children was when he would call them, as S.B. never had them call him. T.N. also testified that when he was given visitation with the children following the September 2019 hearing, he discovered that his number had been blocked on A.J.N.'s cell phone.

T.N. also testified at trial that the children have been with him since May 2020. He stated that his relationship with them is

> great. . . . [T]hey're happy they get to spend every day with their Dad, and now have a Mom, which is somethin' they never technically had. . . . [T]hey like having other siblings there. That's what really shocked me, is that, how good they gelled together, 'cause the other siblings are only four, five and six, and they're eleven and twelve. But they all get along great. . . they like being in a bigger city with more to do, and having . . . a whole . . . family under one roof.

T.N. further testified that, as a family, they have board game and movie nights, bake cookies, play video games, swim in their pool, and play outside. He also stated that his wife gets along with the children.

T.N. also said that he was not currently aware of how the children were doing in school "because I haven't talked to their Grandma about their grades this year, especially with the [corona]virus [pandemic] and how they had to go to on line school. I never found out from her how they was (sic) doing."

T.N.'s wife, A.J., also testified at trial. She stated that she has three children, ages six, five, and four, and that for the last two months, A.J.N. and S.R.N. had also been living with her and T.N. She testified that she is an insurance specialist who has her own L.L.C. and currently does work for a roofing company. She explained that she works when she wants to and is also able to work from home.

12

She also testified that if neither she nor T.N. are able to be home, they leave the children with a neighbor who is always available. She said there is always someone with the children, even if A.J. and T.N. go out to dinner or grocery shopping.

A.J. further testified that having A.J.N and S.R.N. has "been going awesome." She said that her children and T.N.'s children all get along well, and that S.R.N. shares a room with her five-year-old and they have bunk beds. A.J. stated that there are "great schools", they have a lot of neighbors who have kids, and they all get along.

T.N.'s children also testified at trial. A.J.N. was twelve years old and in the seventh grade at the time. She testified that living in Texas with her dad has "been great", she is always "treated right and loved", and she likes being in a big family. A.J.N. also stated that if she could decide where she wanted to live, she would choose her dad's house in Texas.

A.J.N. also testified that while living with S.B., she was on the A/B honor roll at school, she was active in her church, participated in the church choir and praise dance, and was a cheerleader at her school. She agreed that she "had a pretty good life" with her grandmother.

A.J.N. also testified as to a May 4, 2020 incident that occurred between her sister, S.R.N., and S.B., which A.J.N. video-recorded on her cell phone and sent to T.N. She stated that she recorded the incident because no one believed her "about how our Grandmother was giving us whupping, and when I told Ms. Gaye [sic] [Coleman] she didn't believe me." She testified that on May 4, 2020, she was doing her homework in S.B.'s home, and S.R.N. was getting in trouble while doing her math homework. In addition to the video, A.J.N. also sent a text message to

T.N. stating: "Nana always be getting on her. If [S.R.N.] has done the problem before, she would get mad if she doesn't remember. [S.R.N.] sometimes forgets. She can't just yell at her like that, and then whup her for it." She also indicated to T.N. via text message that she was scared and shaking.

The video recording of the incident was played during the trial. While neither S.R.N. nor S.B. can be seen in the video, S.B. can clearly be heard continuously screaming and cursing angrily at a child while doing a math problem. In addition, S.B. can be heard loudly striking a child multiple times and the child screaming.

A.J.N. testified that S.B.'s behavior that was video-recorded was typical, and that S.B. spanks them that hard all of the time and screams like that all of time. She indicated that S.B. would use the same tone and language every day and would get mad about everything. She also indicated that S.B. had previously given her "a whupping" similar to that heard on the video of S.B. and S.R.N.

S.R.N. stated at trial that she was eleven years old and in the sixth grade. With respect to the May 4, 2020, incident, she stated that the incident went on for a long time, that S.B. was screaming and hollering at her, and that S.B. had hit her with a belt. She stated that she was scared to go back to live with S.B. and that she wanted to live with T.N. in Texas. S.R.N. also stated that neither she, nor A.J.N. have been left home alone with A.J.'s kids, and that either her step-mother or their friend is always with them.

S.B. also testified at trial. She stated that she has lived at her current address in Alexandria for two years and that it is a three-bedroom, two-bathroom home with a large backyard and garage. Prior to that, she lived at another address in Alexandria for seventeen years.

She explained that when she filed the initial petition for transfer of custody, the process was through Volunteers of America, who referred her to an attorney. S.B. testified that she never had to go to court "because I was under guidelines, and they typed all of that up while I was sitting there." She stated that T.N. personally came to the attorney's office and signed the affidavit in front of a notary. S.B. also testified that T.N.'s signature was on the back of the December 29, 2016 consent judgment agreeing to pay $500.00 per month for both of the children, approving the judgment as to form.

S.B. also testified that she previously worked for the Alexandria City Marshall's office, where she worked in the courtroom, activated and deactivated warrants, and handled bonds, tickets, and jail releases. However, as of the time of trial, she had not worked since March 17, 2020.

According to S.B., A.J.N. was an A/B student. She also explained that while S.R.N. had a D in math the third nine weeks of school, she started making all A's when, due to the coronavirus pandemic, she was at home with S.B. doing online school. She said that A.J.N. was a cheerleader and S.R.N. was on the track team at school. S.B. also said that they attended church regularly and that she was the youth director at the church. S.B. further testified that her future goals and aspirations for the children were for them to grow up and be "the brightest and smartest little kids," and that if

> one of 'em wanta dance and be a cheerleader . . . that's her goal, and the other one, yes, she wants to run track and do different things. And I told 'em whatever they wanta do. I'm, I've always been there. I never miss anything they had, to push them to do and be their very best. . . . So, jus' growing up and being able to care for theyself (sic), and not letting somebody dictate how they should look.

With respect to T.N.'s involvement with the children, S.B. testified that T.N. did not attend awards days or other events that the children were involved in and he always had an excuse to be other places. She said that he went to "two tracks in five years" but never went to any cheerleading events. S.B. also stated that after T.N. left the military and moved to Houston, he participated in body building competitions, and S.B. brought the children to three of those events. S.B. also said that she would bring the children on family trips, but T.N. would never attend, despite being told about them.

As far as financial support of the children, S.B. testified that she received some measure of support from T.N. over the years, but not consistently. S.B. testified that she and T.N. shared a bank account into which he had agreed to put money, and that she was able to withdraw money from that account. According to S.B., she received $790.00 from T.N. in 2016, $1,270.00 in 2017, $3,000.00 in 2018, and $1,600.00 in 2019.

S.B. testified that she would like to continue to have custody of the children. When asked what concerns she had regarding the children living with their father in Texas, she testified:

> My son . . . has had a DWI before. My son, ah, treats them differently. . . . [A.J.N.] got a phone, and he bought her another one at ten. And when we had a party last year, the big bash with all the girls, he bought [A.J.N.] another phone, and . . . she was excited. But [S.R.N.] he gave her twenty dollars . . . . Even with the house they're in, [S.R.N.] told me she did not have a bed. [A.J.N.] had a bed. He told her, well, you be good you might get one sooner or later . . . . He testified in the room wit' [Judge] Metyoer, well . . . she likes to sleep on the floor. She's never slept on the floor at our house, and never have (sic) a problem with sleeping in her own room.
>
> . . . .
>
> . . . [A.J.N.] told me that, when they go out, him and his new wife, and two times at Christmas and one before Christmas, they go out at

nighttime and they leave her at home to baby sit all those children. She told me she had to cook noodles . . . and she had to cook hot dogs for 'em one time.  And I say, what are you doing cooking on the stove . . . .  Ah, when he had 'em before he punched them because they stole two cookies and told them to drink the whole gallon of apple juice, and eat the whole box of chocolate chip cookies until they threw up.

S.B. also testified that she was concerned that T.N. and his wife allowed the girls to wear makeup, false nails and eyelashes, long braids, and shorts that were too short, and that, in her opinion, they looked like "little prostitutes."  S.B. mentioned a video of the girls taken in July 2019 where, in her opinion, they were dressed inappropriately, but she further indicated that she did not know if they were just playing dress up, or otherwise what they were doing.  S.B. also mentioned that T.N. would punish the girls by making them lift fifteen-pound weights or by making them hold rice in their hands.

With respect to the incident that occurred on Father's Day weekend of 2019, S.B. testified:

> And the girls went with him, so that Sunday they was supposed to come back, and he had [A.J.N.] to text me while I was in church that Daddy say what time you coming to get us? And I said, ahm, well first of all, I said, you need to ask your Daddy, 'cause he hasn't given me any money for ya'll, ah, for the month.  And that's when she must've told 'im, and he sent me a nasty text. Ain't nobody worried about no damn money, that, ah,
>
> . . . .
>
> . . . . Again, I wasn't arguing with 'im, I said well, [T.N.], I'm not feeling well.  I have rheumatoid arthritis, and I was just had diagnosed with rheumatoid arthritis, and I told 'im that my ankle and leg was hurtin', I wasn't coming all the way there, but I would meet him in Kinder, like we used to some time, at the bridge.

Thereafter, according to S.B., she went to the bridge to meet him, but when he was not there by six o'clock, they "had extra words after that," and T.N. told her he was going to start sending gift cards and track the money that is used for them.

The following day, S.B. spoke to A.J.N. on the phone and she told her she was at her dad's house, her dad was at work, and that he would be home later in the day. Then, after a week, S.B. informed a police officer about the circumstances and T.N. was eventually arrested and the children were returned to her.

With respect to the May 4, 2020 incident with S.R.N., S.B. explained that S.R.N. is the "type" that she has to "stay on top of" and "push." According to S.B., S.R.N. woke up that day with an attitude and did not want to do anything. They were sitting at the table doing schoolwork, and, according to S.B., S.R.N was

> looking at it and know the answer, but she's so stubborn she won't tell you the answer. So I had to keep going over wit' her, and then. . . I said, well, you know, that's enough. So, if you don't wanta do it, go in your room, and I popped her; no belt was involved. . . . [S]he's the type, you could pop her a little, and she's gonna scream like you kilt 'er.

S.B. testified that she hit S.R.N. six times during the incident, and that was typically how she would discipline if she had to use physical discipline. She denied using a belt during the incident. However, she stated "I'm not gonna say in the past . . . that they haven't gotten a spanking with a belt." S.B. also explained that "the words that I use[d] are not normal words, not something I do every day, but I was frustrated . . . . I was in my own home, it wasn't around anyone." S.B. further explained that the video was started after the incident had been going on for a while and the video did not show how she was initially going over the math with S.R.N., but that S.R.N. was not attending to what she was being told to do; rather, she was doing what she wanted to and not doing the math the correct way.

Two reports prepared by Lauren Gay Coleman, JD, LSCW, with Changes, LLC, were also submitted into evidence. In her December 11, 2019 report, she noted that she had met with T.N. on October 11, 2019, A.J.N. and with S.R.N. on

October 25, 2019, and S.B. on November 25, 2019.  Her recommendation stated as

follows:

> The children have lived in a stable and happy environment for almost 10 years.  [S.B.] has ensured that they received a quality education . . . .  She facilitated the girls' participation in extra-curricular activities and involved them in church activities. . . . [E]xcept for his times of deployment, [T.N.] made the voluntary decision to allow the girls to remain with his mother while he selfishly pursued his own agenda. . . .

> I was presented with no evidence to indicate that the children would be in danger if they reside with [T.N.]. . . He currently resides in Houston in a 5 bedroom home that provides appropriate shelter for the girls.  He is working and financially can care for the girls. . . .  The girls seem to have developed a close relationship with [T.N.]'s fiancé and her children and they all participate in activities as a family.  Both girls expressed to me that they enjoy being with their father and feel like they are part of a family.

> Although concerns were addressed about T.N.'s PTSD, there was no evidence it has negatively affected his ability to parent his children. . . . [H]e is [] currently in counseling to address his PTSD.

> In the event the court grants custody to [T.N.], I believe it would be in the best interest of the children for [S.B.] to be granted specific visitation rights. . . .  The children expressed a preference for having continuing contact with their family in Alexandria.

> I am concerned about the parties' criticism of each other in front of the minor children. . . .  I would caution both parties about speaking negatively about the other party in the presence of the minor children.

Ms. Coleman met with A.J.N. and S.R.N. again in the summer of 2020.  She

then issued a report, dated June 21, 2020, which stated the following:

> . . . .  The girls do not want to live with the grandmother and this point they do not want to visit with her or their great-grandmother because they do not feel loved by either of them.  [A.J.N.] and [S.R.N.] both told me that neither their grandmother nor their great grandmother have called them since they have been with their father.

> . . . .

> I am still of the opinion that it would be in the best interest of the girls to reside with their father in Texas.  They feel loved and accepted

there. . . . Children do better when they feel safe and consistently loved, which includes being treated with respect.

Based on my recent discussions with the girls and my review of the [May 4, 2020] video, it is my opinion that S.B. is verbally abusing the children. . . . I am also concerned that there is physical abuse occurring as well. The video certainly would indicate extreme corporal punishment was being administered.

. . . . The girls are no longer desirous of visiting with their grandmother or great-grandmother because of the way they have been treated. . . . The girls also told me the "abuse" has gotten worse since the last court date and I am concerned [S.B.] will retaliate against the girls if she is granted visitation at this time. I do believe she should have uncensored telephone or Facetime contact with the girls . . . so she and the girls have an opportunity to rebuild a positive and loving relationship as I truly believe she loves the girls[.]

On appeal, S.B. argues that we should reverse the juvenile's court's ruling and reinstate her with custody of the children because the children have been in her continuous care for most of their lives and are thriving, while T.N. has been inconsistent with contact or visitation despite having the time and means to do so, suffers from PTSD, and has utilized bizarre disciplinary tactics. S.B. also notes that she is a stern and loving grandmother, and that, while she has used corporal punishment to discipline the children, reasonable corporal punishment is permissible in Louisiana.

S.B. further argues on appeal that this case is analogous to *George v. Dugas*, 15-939 (La.App. 3 Cir. 3/16/16), 188 So.3d 376, *writ denied as improvidently granted*, 16-710 (La. 11/07/16), wherein this court reversed the district court's judgment that returned custody of the children from non-parent custodians to the biological parents, finding that the parents failed to show a material change in circumstances since the initial custody judgment.

In *George,* the children were initially removed by the state from the custody of their parents, adjudicated children in need of care, and placed in the non-parents'

home. After the state filed a petition to terminate the biological parents' parental rights due to their failure to comply with their case plan, the non-parents filed a petition for custody stating that the parents had consented to them being granted custody. The state then dismissed its petition to terminate, and a judgment was rendered granting the non-parents with custody. Approximately ten months later, the parents filed a petition in juvenile court seeking custody of their children, and then two months after that, they filed a similar petition in the civil district court after the juvenile court had relinquished jurisdiction. The district court awarded custody to the parents.

On appeal, this court found that the district court committed legal error in requiring the non-parents to prove that the children would be substantially harmed if they were returned to the parents and held that

> the initial La.Civ.Code art. 133 judgment, whether consensual or considered, is a determination of the unfitness of the biological parent, thereby vitiating the parent's paramount right to custody, and shifting the burden of proof in any following modification proceedings to the parent.
>
> Accordingly, we . . . find that in a case where a non-custodial biological parent seeks to modify custody granted a non-parent under a consent decree, the burden of proof should be on the moving parent to show a material change in circumstances of the custody with the non-parent and that a change of custody would be in the best interests of the child[.]

*George*, 188 So.3d at 383-84. This court then conducted a de novo review of the record, and concluded:

> The record contains ample evidence that the [parents] have rehabilitated themselves in terms of their prior drug abuse. . . . However, because they were found in the initial custody determination to be unfit for custody of the children, their rehabilitation alone is not enough to meet the burden of proof required of them. . . . The record before this court does not show that the adequate and stable environment in which the children were placed with the [non-parents] has materially changed. . . . There is literally

21

no evidence in the record of a change in the circumstances of the children since the Dugases were awarded custody, let alone that a change in custody would be in the best interests of the children. Accordingly, the [parents] have not met the burden of proof required of them[.]

We first note that the initial judgment in *George* that awarded custody to the non-parents was rendered in accordance with La.Civ.Code arts. 133, et. seq. following the initiation of the state's proceedings to terminate parental rights. In the instant case, however, the initial judgment was rendered by the juvenile court following a parent's voluntary transfer of custody filed in accordance with La.Ch.Code. art. 1510, et. seq., due to his upcoming military deployment. Therefore, the analysis provided in *George* is not necessarily controlling in this case.

Nonetheless, unlike the trial court in *George,* the juvenile court in the instant matter did express a concern that the children's environment in the home in which they were initially living (S.B.'s home) had in fact changed. The trial court noted that the 2019 Father's Day incident and the "disturbing" May 4, 2020 video-recorded incident "raise serious concerns about [S.B.'s] role in the lives of these children[,]" and that S.B.'s "actions convince this [c]ourt that she will not support the relationship of the children with their father." The juvenile court further noted T.D.'s fitness to parent his children, as well as the bond that was present between him and his children.

After reviewing the record, we conclude that the juvenile court in the instant case adequately considered the factors set forth in La.Ch.Code art. 1523 when determining whether returning the children to the custody of T.N. following his initial voluntary transfer of custody to S.B. was in the children's best interest. The

record supports the juvenile court's decision, and therefore we find no abuse of discretion on the part of the juvenile court.

## DECREE

For the reasons set forth above, the ruling of the juvenile court is affirmed. Costs of this appeal are assessed to appellant, S.B.

**AFFIRMED.**